1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   PHILIP S. WARDEN (SBN 54752)
2  philip.warden@pillsburylaw.com
   CLARK THIEL (SBN 190212)
3  clark.thiel@pillsburylaw.com
   Four Embarcadero Center, 22nd Floor
4  San Francisco, CA 94111-5998
   Telephone:  415-983-1000
5  Facsimile:  415-983-1200

6  PILLSBURY WINTHROP SHAW PITTMAN LLP
   SYDNEY A. WARD (SBN 312615)
7  sydney.ward@pillsburylaw.com
   2600 Capitol Avenue, Suite 300
8  Sacramento, CA 95816-5930
   Telephone:  916-329-4700
9  Facsimile:  916-441-3583

10 KINGSLEY BOGARD
   ROBERT E. KINGSLEY (SBN 59596)
11 Prosecuting Authority for Plaintiff
   rkingsley@kblegal.us
12 600 Coolidge Drive
   Suite 160
13 Folsom, CA 95630
   Telephone:  916-932-2500
14
   Attorneys for Plaintiff SACRAMENTO REGIONAL
15 PUBLIC SAFETY COMMUNICATIONS CENTER
   D/B/A SACRAMENTO REGIONAL FIRE/EMS
16 COMMUNICATIONS CENTER

17              **UNITED STATES DISTRICT COURT**

18             **EASTERN DISTRICT OF CALIFORNIA**

19

20 SACRAMENTO REGIONAL PUBLIC            Case No.  2:18-cv-01792-KJM-KJN
   SAFETY COMMUNICATIONS CENTER
21 D/B/A SACRAMENTO REGIONAL            DECLARATION OF SHERRILL DIANE
   FIRE/EMS COMMUNICATIONS CENTER       HOUSE IN SUPPORT OF MOTION FOR
22                                       PARTIAL SUMMARY ADJUDICATION
                    Plaintiff,
23                                       Date:   August 24, 2018
            vs.                          Time:   10:00 a.m.
24                                       Courtroom:  3
   TYLER TECHNOLOGIES, INC., a Delaware  Judge:  Hon. Kimberly J. Mueller
25 corporation F/K/A NEW WORLD SYSTEMS
   CORPORATION, a Surrendered California
26 corporation

27                   Defendant.

28

-1-

1    I, Sherrill Diane House, declare under penalty of perjury the following:

2         1.      I am the Project Manager retained to manage the replacement of a COBOL computer

3    aided dispatch system for Plaintiff, Sacramento Regional Public Safety Communications Center

4    d/b/a Sacramento Regional Fire/EMS Communications Center ("SRFECC"), and make this

5    declaration in support of SRFECC's Motion for Partial Summary Adjudication filed herein.

6         2.      I have personal knowledge of the statements in this Declaration and, if called as a

7    witness, would and could testify competently thereto from personal knowledge, except as to matters

8    stated on information belief, which I believe to be true.

9         3.      I have worked in public safety emergency services in both the public and private

10   sectors for more than 25 years.

11        4.      From 1993 to 1999, I worked as a dispatcher, trainer, and supervisor for the San

12   Joaquin County Sheriff.  I supervised a staff of eight dispatchers and two jail central control staff.  I

13   answered E911 and business lines for San Joaquin County's Public Safety Answering Point (PSAP),

14   dispatching police, fire, EMS, Search and Rescue, Boat Patrol, Air, and HAZMAT units to the

15   locations of emergencies.  I also trained new dispatchers and provided remedial training on call

16   taking and dispatching.

17        5.      In 1999, I became a CAD Administrator for the San Joaquin County Sheriff.  I

18   managed the Tiburon CAD2000 project upgrade and ongoing maintenance.  I deployed mobile

19   hardware, MDS software, and automatic vehicle locator (AVL) and maintained geofile updates and

20   Real Time Mapping.

21        6.      From 2002 through 2009, I worked for Tiburon, Inc., a company that provides CAD,

22   Mobile, ARS, and RMS products to public dispatch and communications centers.  I installed and

23   configured interfaces and workstation applications, which included testing and debugging.  I created

24   project plans, identified key milestones and project priorities, conducted resource assessments, and

25   led the technical and engineering teams through the project implementation life cycle to meet

26   aggressive deployment schedules.  In addition, I created new processes and demonstration systems

27   and directly managed functional and technical proposal writers.

28        7.      From 2008 to 2013, I served as the Director of Public Safety for Intergraph in

-2-

Belgium, where I was responsible for Belgium's nationwide CAD and Mobile program.

8.      From 2013 to 2016, I served as the Director of Operations for TriTech Software Systems/Tiburon, Inc. in San Diego.  I managed a team of project managers responsible for the implementation of complex projects valued at 32 million dollars, including the implementation of a CAD system for the city of Houston, Texas.

9.      From 2016 to 2017, I was the Vice President of Operations for Athena Advanced Networks.

10.     From 2017 to 2018, I served as the Interim Communications Manager for the Contra Costa Fire Protection District.  I provided technical management services in all areas of radio and telephone communications, CAD, mobile alerts, and related systems for the District.  I ensured that appropriate procedures were followed to maximize the efficient dispatch of equipment and resources and identified and corrected system deficiencies.

11.     On May 9, 2016, Athena Advance Network contracted with SRFECC to provide project management services to SRFECC in connection with the procurement of the CAD system to replace its legacy COBOL system.  Athena assigned me the role of Project Manager.  On December 1, 2016, I contracted directly with SRFECC to act as Project Manager.

12.     As Project Manager, I frequently reviewed and was familiar with the RFP and Defendant's Response to the RFP.  Attached hereto as Exhibits 13 and 14 are true and correct copies of the RFP and RFP Response.

13.     As SRFECC's Project Manager, I worked directly with Defendant's Project Managers to oversee the performance of the contract.  I worked with three successive Project Managers designated by Defendant:  Jodi Foster, Jim Lucas, and David Bonini.

14.     On September 8, 2016, Jim Lucas submitted a Project Schedule for SRFECC's review and approval that set November 6, 2017 as the date the Defendant system would "Go-Live." SRFECC agreed to the date, and Jim Lucas submitted a confirming email on September 15, 2016.

15.     True and correct copies of the September 8, 2016 email from Mr. Lucas is attached hereto as Exhibit 29 and its attached project schedule is attached hereto as Exhibit 4.

16.     True and correct copies of the September 15, 2016 email from Mr. Lucas is attached

-3-

1   hereto as Exhibit 32 and its attached project schedule is attached hereto as Exhibit 31.

2       17.     On or around July 12, 2017, Larry Piper and David Bonini met with me and

3   Command Staff at SRFECC and informed us that David Bonini would replace Jim Lucas as Project

4   Manager.

5       18.     Defendant failed to provide regular status reports and the few that were provided

6   were not timely, and contained false and misleading information about Defendant's progress and

7   project completion. Defendant falsely represented its completion of certain milestones and RFP

8   requirements throughout the process.  Because of these representations, SRFECC was led to believe

9   that the project was progressing toward the anticipated Go-Live date, when in actuality, many

10  components were not compliant.

11      19.     For instance, in June 2017, I received a status report for May 2017 from Defendant

12  that falsely represented that several tasks had been completed that I knew had not been completed.

13      20.     Attached hereto as Exhibit 17 is a true and correct copy of the email from Jim Lucas

14  sending us the May 2017 status report.  Attached hereto as Exhibit 27 is a true and correct copy of

15  the attached May 2017 status report from Defendant.  Attached hereto as Exhibit 28 is a true and

16  correct copy of the May 2017 status report from Defendant that I annotated to show which items had

17  been falsely marked "completed."

18      21.     In June 2017, I created an Excel spreadsheet listing every RFP technical requirement

19  in order to review the functionality of Defendant's system against the RFP in preparation for

20  functional tests scheduled to occur in August 2017.

21      22.     During June and July 2017, I met regularly with the SRFECC CAD Build team and

22  we went through the Excel spreadsheet line by line and tested Defendant's software to confirm

23  whether it met the requirements.

24      23.     We completed this process on or around August 6, 2017.  I compiled the results of the

25  review in the spreadsheet and a Microsoft Word Document, which I sent to David Bonini on or

26  around August 6, 2017.

27      24.     Attached hereto are true and correct copies of the email (Exhibit 22), the attached

28  spreadsheet (Exhibit 24), and the attached Word document (Exhibit 23) that I sent to David Bonini

1   on August 6, 2017.

2        25.    Bob Motzny, Defendant's Director of Project Management, proposed testing

3   Defendant's system with reference to the Excel spreadsheet and using the Word document only as a

4   supplement document "[i]n the interest of getting through the functional testing (RFP compliance) in

5   a systematic and efficient manner."  Consequently, I added the comments from the Word document

6   to the Excel spreadsheet so that we would only need to work with a single document going forward.

7        26.    A true and correct copy of Bob Motzny's email to me is attached as Exhibit 19.

8        27.    On or around August 15, 2017, in addition to weekly project status meetings, I

9   decided that we needed greater involvement from Defendant's executive team, and I implemented

10  executive project calls twice a week with Defendant representatives David Bonini, Larry Piper, Bob

11  Motzny, Craig Nelson, Craig Sayers, Sean Gallagher, and Kevin Flynn.

12       28.    Mr. Bonini updated the Excel spreadsheet with Defendant's comments and sent it

13  back to me on 8/21/2017.  I updated the file and returned it to Mr. Bonini on 8/31/2017.  A true and

14  correct copy of this correspondence is attached as Exhibit 26.  Mr. Bonini and I continued to

15  regularly discuss, update, and exchange a copy of the spreadsheet as a way to track compliance or

16  non-compliance with each technical requirement through December 13, 2017.

17       29.    Defendant's representatives came on site in late August 2017 to review the completed

18  CAD build and continue reviewing failed RFP areas.

19       30.    On September 1, 2017, Mr. Flynn sent an email to me, Teresa Murray, and others,

20  including David Bonini, Bob Motzny, and Larry Piper, confirming that the Go-Live date scheduled

21  for November 6 would be postponed due to the number of unresolved issues identified during the

22  functional review process.

23       31.     A true and correct copy of Mr. Flynn's September 1, 2017 email, and Teresa

24  Murray's response (which I also received), are attached hereto as Exhibit 18.

25       32.    During the September 6, 2017 executive call, Mr. Flynn stated that Defendant would

26  need several weeks to propose a "recovery" plan with a new Go-Live date.

27       33.    Over the next month, I continued to confer with Larry Piper and David Bonini to

28  discuss the status of the Project and the numerous failed RFP items.

-5-

34.    In November 2017, Defendant planned to visit SRFECC to meet with me and the CAD Build team in person to discuss and review the numerous failed RFP items.

35.    True and correct copies of the email correspondence arranging the onsite visit are attached hereto as Exhibits 15-16.

36.    Mr. Piper and Defendant's Solution Architect and Subject Matter Expert ("SME") Jerrold Emery, among other Tyler representatives, came on site on November 16, 2017 to continue reviewing failed RFP items.

37.    Because of the Go-Live cancellation, SRFECC sought assurances from Defendant that it would complete the project in a timely manner.

38.    On December 1, 2017, Mr. Flynn sent Teresa Murray and myself four documents that are the result of the "interim plan" developed by Defendant for performance of the contract.  He also copied David Bonini, Larry Piper, Bob Motzny, Brian Leary, Jerrold Emery, and Bryan Proctor. The four documents include a PowerPoint presentation; two separate MS Project Plans; and an Excel spreadsheet identifying the unresolved items Defendant had identified as "Priority-1" items.

39.    A true and correct copy of Mr. Flynn's December 1, 2017 email and the attached PowerPoint presentation are included herein as Exhibits 21 and 5, respectively.

40.    Mr. Flynn's email stated that a more detailed spreadsheet was available from me or from David Bonini.  This referred to the Excel spreadsheet tracking all RFP items that David Bonini and I had been exchanging, discussed *supra* ¶¶ 21-26.

41.    On December 7, 2017, Mr. Flynn gave a presentation at SRFECC regarding the status of the Project in response to SRFECC's request for assurances.  I was present for the entire presentation, which lasted about one hour.  Mr. Flynn used the PowerPoint presentation he had sent me on December 1, 2017 during the presentation.

42.    During the presentation, Mr. Flynn admitted that "34 items . . . failed to comply with the RFP requirement[;] 41 items that are warranty items (i.e. not working as designed, and will be resolved in a future release)[;] 7 items that are requests for enhancement to the application; [and] 79 items that may have not met the RFP requirements."

43.    Mr. Flynn's presentation also identified a "handful of items" that did not align with

its "product strategy" and "have been eliminated from consideration." Mr. Flynn admitted that Defendant would never be able to provide software that met at least four technical requirements.

44.     Mr. Flynn estimated that Defendant's recovery plan for the "completion of these items given the capacity of the development team" would take 33,900 hours – and that Defendant's capacity for the entire public safety segment of its customer base was limited to only 3,000 hours of development time per year.

45.     Mr. Flynn estimated that Defendant could only commit between 1,500 to 2,000 hours per year to the SRFECC Project. This means it would take Defendant between 17 years (33,900 ÷ 2,000) and 22 years (33,900 ÷ 1,500) to deliver a partial CAD system.

46.     Following the presentation, I emailed Mr. Bonini to ask for the list of the 34 items that Mr. Flynn described as failed RFP items during his presentation. Mr. Bonini responded that those items corresponded to the RFP items that he and I had marked as "Development" in the Defendant Status Column.

47.     A true and correct copy of this correspondence is attached as Exhibit 31.

48.     I also emailed Larry Piper and David Bonini to ask for assistance reconciling the problems identified in Mr. Flynn's presentation and to note that SRFECC was still waiting for additional information from Mr. Flynn regarding projected completion of the contract.

49.     A true and correct copy of this correspondence is attached as Exhibit 20.

50.     On December 13, 2017, Mr. Bonini and I had a telephone call where we reviewed the Excel spreadsheet listing each technical requirement and annotating whether the Defendant system met each requirement. Mr. Bonini was having computer problems and asked me to manually enter changes to the document as we discussed them. I did so, and sent him a copy of the updated spreadsheet at the conclusion of our call.

51.     A true and correct copy of my email to Mr. Bonini is attached as Exhibit 25. A true and correct copy of the updated spreadsheet attached to the email is attached as Exhibit 6 (also Exhibit 6 to the Complaint).

52.     This document identifies 239 RFP items that SRFECC and Defendant agree failed. I reviewed each of these items and checked it against New World's Response to the RFP. I

-7-

1   discovered that of the 239 failed RFP items, New World had indicated that its system was "Fully

2   Comply" with 172 of them.

3        53.   I created a list of the 172 RFP items that Defendant agreed failed that correspond to

4   "Fully Comply" responses in the RFP.  A true and correct copy of this list is included as Exhibit 7.

5        54.   The failed RFP items include mission critical requirements.  Mission critical

6   requirements are requirements that are key elements to the functioning of an emergency dispatch

7   system – in other words, elements that enable the dispatcher to speedily locate and assign responding

8   units to the location of an emergency on the most efficient route possible.  SRFECC dispatchers

9   must be able to use the CAD system to determine the exact location of an emergency and to send the

10  appropriate response, like a fire engine or an ambulance, via the most efficient route.

11       55.   The first question you will be asked when you call 9-1-1 is "Where is the location of

12  your emergency?"  You might answer with a street address (e.g., "700 D St"), or you might answer

13  with a common name, like "Starbucks," or with an intersection like "Old Placerville Rd and

14  "Rockingham Way," or an alias name like "MLK" for "Martin Luther King."  The dispatcher who

15  answers your call needs to be able to enter and verify your exact location in the CAD system,

16  regardless of the way you answer their question, in the fastest way possible.

17       56.   Examples of failed RFP items that were falsely marked "Fully Comply" and that are

18  critical to SRFECC dispatch services include the following:

19       57.   RFP Requirement 5.2.5.6.C.a states that the CAD system must be able to provide type

20  ahead functionality that displays possible address matches.  For example, if the dispatcher types

21  "Roc/Old," the type ahead functionality would produce a match for "Rockingham Way/Old

22  Placerville Rd."

23       58.   Even though this item was marked "Fully Comply," Defendant's system does not

24  have this type-ahead functionality, which creates significant delay in identifying a caller's location.

25  In Defendant's system, the dispatcher must type the full street name "Rockingham Way/" before the

26  option for "Placerville Rd" will appear.  On August 15, 2017, David Driskell – who is one of

27  Defendant's subject matter experts or "SMEs" – advised me that the System did not have this

28  capability and Defendant would need to do additional research to provide it.

-8-

59.   David Bonini likewise confirmed that this requirement failed during our review and exchange of Exhibit No. 6.  Mr. Flynn identified this as a failed RFP requirement during his presentation on December 7, 2017.  His presentation shows that the target date for the development and release of this functionality would be the fourth quarter of the year 2020, three years after performance was due.

60.   RFP Requirements 5.2.5.6.D and 5.2.5.9.D state that the CAD system must be able to provide possible address matches even when the dispatcher provides a partial or misspelled street name or intersection.  Even though these items were marked "Fully Comply," Mr. Flynn and Mr. Bonini agree that Defendant's system does not meet them.  Mr. Flynn identified these as failed items in his December 7, 2017 presentation, and Mr. Bonini likewise confirmed that they were failed items during our review and exchange of Exhibit No. 6.  Mr. Flynn's presentation shows that Defendant's target date for the development and release of this functionality would be the second quarter of the year 2020.  This failure creates significant delays in locating an emergency.  For example, in SRFECC's current legacy system, a dispatcher is able to type the word "Elk," and the option for "Elk Grove Florin Rd" will appear.  In Defendant's system, the dispatcher must type "Elk [space] Grove [space] Florin."  If the dispatcher instead types "ElkGrove," no options will appear.

61.   Even though marked "Fully Comply," Defendant's system does not meet RFP Requirement 5.2.5.6.F.b, which requires the system to present lists of intersection possibilities.  For example, if a dispatcher types "Cal/Fair," two intersections should appear:  one for the intersection of California/Fair Oaks in Fair Oaks and one for the intersection of California/Fair Oaks in Carmichael.  Mr. Driskell advised me on 8/15/2017 that this functionality will not work where multiple venues (e.g., Carmichael and Fair Oaks) are present.  This is a significant problem because there are hundreds of intersections with multiple venues (known as "community codes") within Sacramento County.  Mr. Bonini likewise confirmed that this was a failed RFP item during our review and exchange of Exhibit No. 6.

62.   RFP Requirement 5.2.5.1.2.D requires the system to provide latitudinal and longitudinal coordinates in state-designated formats, i.e., degree-min-sec, decimal degrees, or UTM.  On November 16, 2017, Defendant's Solution Architect, Jerrold Emery, advised me that DMS, X/Y,

-9-

1   DDM, and UTM are not available formats, even though this requirement had been marked "Fully

2   Comply" in response to the RFP.  Mr. Bonini likewise confirmed that this was a failed RFP item

3   during our review and exchange of Exhibit No. 6.  Defendant did not propose any plan to comply

4   with this requirement.

5          63.     RFP Requirement 5.2.5.6.B requires the system to provide look-up aids, such as

6   "soundex" or "metaphone," for street names, intersections, commonplace names, landmarks, or

7   street or highway route numbers.  This functionality is intended to assist dispatchers in identifying

8   the correct address for locations that sound alike, but are spelled differently, e.g., "Oselot Way" and

9   "Ocelot Ct."  Even though this requirement was marked "Fully Comply," Defendant's system does

10  not meet this requirement.  In order to use Defendant's system, the dispatcher must be able to enter

11  the exact spelling of a street name for address entry.  Mr. Bonini confirmed that this was a failed

12  RFP item during our review and exchange of Exhibit No. 6.  Defendant did not propose any plan to

13  comply with this requirement.

14         64.     RFP Requirement 5.2.5.6.F.c. requires the system to provide support for identifying

15  commonplace names.  Even though this requirement was marked "Fully Comply," Defendant's

16  system does not display all addresses corresponding to a commonplace name.  Defendant

17  recommended that callers identify where they are by store number, e.g., "Starbucks 1234" or

18  "McDonalds 5678."  But most people do not know the store number or exact address for

19  commonplace locations, especially during an emergency.  Mr. Flynn admitted that the system does

20  not meet this requirement during his presentation on December 7 and provided Defendant's target

21  date for the development and release of this functionality would be the second quarter of the year

22  2022.  Mr. Bonini confirmed that this was a failed RFP item during our review and exchange of

23  Exhibit No. 6.

24         65.     RFP Requirement 5.2.5.6.I provides that the dispatcher must be able to restart the

25  location look-up with a new address.  Callers often struggle to identify the location of their

26  emergency, and the address verification process must restart many times.  (For example, a caller may

27  first say that she is at Mather/I 50, and then say, "I mean Bradshaw/I 50.")  Even though this

28  requirement was marked "Fully Comply," Defendant's system does not allow a dispatcher to restart

-10-

the location look-up.  Instead, the dispatcher must exit the address verification window and then open a new one.  The dispatcher is not able to type over the erroneous location.  Mr. Flynn admitted that the system does not meet this requirement during his presentation on December 7 and provided Defendant's target date for the development and release of this functionality would be the final quarter of 2018.  Mr. Bonini confirmed that this was a failed RFP item during our review and exchange of Exhibit No. 6.

66.     RFP Requirement 5.2.5.6.T requires the system to allow a dispatcher to enter a street name without a block range or a city.  For example, if a caller reports an emergency on Folsom Blvd, the dispatcher should be able to enter "Folsom Blvd" and see possible locations that the dispatcher can then list to the caller to help them ascertain their location.  Defendant's system does not provide this functionality, even though it marked this requirement as "Fully Comply."  A dispatcher must always enter an address number to begin the search for possible locations.  Mr. Flynn acknowledged that Defendant's system did not meet this requirement and projected that this requirement would not be met until the last quarter of 2019.  Mr. Bonini confirmed that this was a failed RFP item during our review and exchange of Exhibit No. 6.

67.     RFP Requirement 5.2.5.7.G requires Defendant's system to be able to identify specific locations within multi-unit structures.  For instance, if a caller reports his or her location as "Arden Fair Mall," the system is supposed to display all the stores within the mall.  Even though this requirement was marked "Fully Comply," Defendant acknowledges that its system failed this requirement.  On 11/16/17, while onsite at SRFECC, Defendant's SME Jerrold Emery advised me that this "enhancement" is still being built into the system and projected a target release date as the second quarter of 2018.  Mr. Bonini confirmed that this was a failed RFP item during our review and exchange of Exhibit No. 6.

68.     RFP Requirements 5.2.6.4.B.1 and 5.2.12.8 provide that the system must display latitude and longitude values.  Even though this was marked "Fully Comply," these values do not display in Defendant's system.  In order to find latitude and longitude values, a dispatcher must open the mapping client, find the location of the incident manually, and hover over the location with his or her mouse and then read the coordinates from the temporary label – a slight move of the mouse will

DECLARATION OF SHERRILL DIANE HOUSE ISO MOTION FOR PARTIAL SUMMARY ADJUDICATION

1    change the value.  This is extremely problematic because it would impede SRFECC's ability to

2    quickly and accurately deploy emergency aid to remote locations or to dispatch air ambulances or

3    other units that require coordinates.  According to Mr. Flynn, this functionality was projected for a

4    target release date in the last quarter of 2018.  Mr. Bonini confirmed that this was a failed RFP item

5    during our review and exchange of Exhibit No. 6.

6         69.    RFP Requirement 5.2.2C.b provides that the dispatcher must be able to tab through

7    fields.  This is critical, because it allows emergency responders to "tab" past unused fields quickly.

8    Mr. Flynn advised that this functionality does not align with Defendant's CAD Product Roadmap or

9    the current demand of its user base, and consequently Defendant would not comply with this

10   requirement, even though it had been marked "Fully Comply."  Mr. Bonini confirmed that this was a

11   failed RFP item during our review and exchange of Exhibit No. 6.

12        70.    RFP Requirement 5.2.2C.f provides that SRFECC must be able to configure button

13   labels and field names in order to incorporate individualized nomenclature.  For example, while the

14   police department may refer to a geographic area as a district, the fire department may refer to it as a

15   zone.  SRFECC contracted for a system that would allow it to change the nomenclature in one

16   discrete area of the system without changing it in all areas of the system.  Mr. Flynn confirmed

17   during his December 2017 presentation that Defendant's system does not comply with this

18   requirement and that Defendant did not intend to comply because the item did not align to its

19   product roadmap or the demand of its customer base, even though this item had been marked "Fully

20   Comply."

21        71.    Each of these failures increases the time it takes to process an emergency call.  These

22   functions, among others, are critical to a dispatcher's ability to speedily locate and assign responding

23   units to an emergency via the most efficient route possible.  In an emergency, a delay of minutes or

24   seconds can mean the difference between life and death.  Time is a crucial factor in delivering aid to

25   people who need it.

26        72.    In addition to the fact that these failed RFP items were critical elements of the CAD

27   system that SRFECC contracted to purchase, Defendant's false representations during the RFP

28   process resulted in it receiving a score higher than competing bids.

-12-

73. Each vendor received a score for its bid based on a weighted formula.

74. I have reviewed the data and formula used by the Evaluation Committee to score each response to the RFP.

75. Under this formula, each vendor's responses to the technical requirements of the RFP constituted 30% of its final score.

76. Each response marked "Fully Comply" received 3 points; "Compliant as Modified" responses received 2 points; "Partially Compliant" responses received 1 point; and "Not Compliant" responses received 0 points.

77. Each technical requirement was also assigned an individual weight.

78. SRFECC used a spreadsheet to record and calculate each vendor's score. Using this spreadsheet, I changed the value of each false RFP response (identified in Exhibit 7) from 3 points to 0 points for "Not Compliant." The spreadsheet then automatically re-calculated Defendant's score.

79. Defendant's total score decreased from 81.99% (the highest of the three competing scores) to 78.77% (the lowest score).

80. As Project Manager, I oversaw both Defendant's performance and SRFECC's performance of the contract.

81. During my tenure, I ensured that SRFECC paid the invoices it received from Defendant pursuant to the contract schedule.

82. Defendant never certified that it completed GANTT Steps 6, 8, or 10 nor invoiced SRFECC for same.

83. SRFECC also provided the personnel and equipment called for by the Agreement to facilitate Defendant's performance of the contract.

84. SRFECC obtained the specifications for the equipment and related components Defendant required and installed them so that they were available for use in advance of Defendant's delivery of its system.

85. SRFECC provided a consistent Project Manager (me) over the course of the project (as opposed to Defendant's use of three different managers), a CAD Build team, an IT team, and the involvement of an executive team through SRFECC's Command Staff.

-13-

86.     The Command Staff and I engaged in weekly calls with Defendant, provided timely responses to Defendant's requests for information, coordinated with Defendant on an agreed-upon schedule, and provided timely input on the design and use of the system.

87.     SRFECC had qualified personnel available to be trained to use Defendant's system.

88.     SRFECC had a full CAD Build team participate in every training and configuration event.

89.     Each member of the Build team had a "backup" so that a full team was available at all times.

90.     Because Defendant failed to perform the contract, SRFECC has not obtained the benefit of the system it contracted to receive.  SRFECC must continue to rely on an aging system that is increasingly expensive to maintain and lacks the functionality of the system it sought to procure.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _27 July 2018_ at _Oakdale_, California.

_Sherrill Diane House_
Sherrill Diane House