Beth W. Petronio *(admitted pro hac vice)*
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5815
Fax: (214) 939-5849
beth.petronio@klgates.com

Malcolm Segal (SBN 075481)
John T. Kinn (SBN 130270)
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: (916) 441-0886
Facsimile: (916) 475-1231
msegal@segal-pc.com
jkinn@segal-pc.com

Attorneys for Defendant TYLER TECHNOLOGIES, INC., a Delaware Corporation F/K/A NEW WORLD SYSTEMS CORPORATION, a Surrendered California corporation

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO REGIONAL PUBLIC SAFETY COMMUNICATIONS CENTER D/B/A SACRAMENTO REGIONAL FIRE/EMS COMMUNICATIONS CENTER,

Plaintiff,

vs.

TYLER TECHNOLOGIES, INC., a Delaware corporation F/K/A NEW WORLD SYSTEMS CORPORATION, a Surrendered California Corporation,

Defendant.

Case No.: 2:18-1792-KJM-KJN

**DEFENDANT'S SEPARATE STATEMENT OF DISPUTED FACTS REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION PURSUANT TO LOCAL RULE 260(A)**

Date: September 19, 2018
Time: 2:00 pm
Judge: Hon. Kimberly J. Mueller
Courtroom: 3

Pursuant to Local Rule 260 and Rule 56 of the Federal Rules of Civil Procedure, Defendant Tyler Technologies, Inc. ("Tyler") submits this Separate Statement of Disputed Facts Regarding Plaintiff Sacramento Regional Public Safety Communications Center d/b/a Sacramento Regional Fire/EMS Communications Center's ("SRFECC") Motion for Partial Summary Adjudication (the "Motion") [Dkt. No. 10].

| | **DISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 1. | Tyler is the largest software company in the nation that focuses solely on providing integrated software and related technology services to the public sector. | Declaration of Kevin Flynn Declaration ("Flynn Dec.") at ¶5 |
| 2. | Tyler's Public Safety division has implemented CAD systems for hundreds of public entities, including various counties in and around Northern California. | Flynn Dec. at ¶5 |
| 3. | On March 18, 2014, SRFECC issued the RFP for a new CAD system. | Exhibit 13.  All references to Exhibits are references to the exhibits attached to SRFECC's Motion. |
| 4. | The RFP expressly noted that the "purpose of the project is to replace the existing Computer Aided Dispatching system and Mobile Data System in use at SRFECC with a Commercial Off The Shelf (COTS) solution.  Customizations or enhancements to the product in order to comply with requirements of this RFP shall be identified and priced separately." | Exhibit 13 at p. 6 |
| 5. | Item 5.2.1 of the RFP also specifically acknowledges "the intention of SRFECC to purchase primarily 'off-the-shelf' or basic CAD software functionality, requiring the minimum amount of modifications in order to support necessary functions and interfaces…[.]" | Exhibit 13 at p. 61 |

| | | |
|---|---|---|
| 6. | The RFP contained over 2000 line items of desired functionality and requested that New World specify whether its proposed CAD system complied with the listed requirements. | Exhibit 13 at pp. 16, 23, 55-173. |
| 7. | The technical requirements contained brief descriptions of the desired functionality, often using undefined terms and sometimes employing only one-word descriptions. | Exhibit 13 at pp. 55-173. |
| 8. | With regard to the technical specifications, New World's RFP Response expressly stated "Our response to your software specifications is based on our interpretation of each feature or requirement. Our response will be accurate in a high percentage of cases. Occasionally, however, our interpretation does not coincide with the prospect's intention. A demonstration of our software will further assure the SRFECC that New World can meet and/or exceed your requirements." | Exhibit 14 at p. 47. |
| 9. | In responding to the RFP, New World exercised commercially reasonable efforts to respond to each line item of the RFP based on the information provided in the RFP and well-known industry standards. | Declaration of Craig Nelson ("Nelson Dec.") at ¶ 13. |
| 10. | During the 18-month procurement process, New World provided numerous demonstrations of the system and its functionality (at least one of which followed a script SRFECC provided to New World) and facilitated visits by SRFECC to other New World customer sites so that SRFECC could observe the software in action. | Nelson Dec. at ¶¶ 14-19. |

| | | |
|---|---|---|
| 11. | According to the RFP, only a portion of the scoring and award process was based on New World's responses to technical requirements; SRFECC also performed an overall analysis of each vendor's responsiveness, management capabilities, cost proposals, and demonstrations of their software product. | Exhibit 13 at pp. 19-22; Nelson Dec. at ¶¶ 20, 25 |
| 12. | The Agreement provided for a standard software license for New World's CAD system, along with related services for its implementation, maintenance and support. | Exhibit 2 |
| 13. | The Agreement recognized that this was a COTS project and obligated New World to provide only the standard software and certain "Standard Software Enhancements and/or Customer Software" that were expressly outlined in Exhibit B-3 to the Agreement. | Exhibit 2 at p. 37. |
| 14. | For modifications or enhancements, the Agreement contemplated an analysis and assessment to verify the scope of each modification and a revised cost and timing estimate for such modification. | Exhibit 2, p. 38. |
| 15. | Based on the revised estimate, SRFECC could determine whether it intended to proceed with a requested modification. | Exhibit 2, p. 38. |

| | | |
|---|---|---|
| 16. | Exhibit B-3 to the Agreement expressly provided that SRFECC would "be reasonable and flexible in not attempting to design the modifications to be more extensive than called for in the scope (cost and schedule) of this project." | Exhibit 2, p. 38. |
| 17. | Exhibit B-3 to the Agreement also provided that SRFECC "agrees to cooperate in not making modifications and enhancements too extensive." | Exhibit 2, p. 38. |
| 18. | The Agreement contained an express software warranty that warranted that "items coded 'Fully Compliant' in New World's Response to Customer's RFP will be met as described in Exhibit N." | Exhibit 2, p. 12. |
| 19. | Exhibit N to the Agreement provided:<br>"All items coded "Fully Complaint" (as qualified) in the New World Detail Response to Customer's RFP Questionnaire will be provided to Customer through currently existing Exhibit A software capabilities, Customer's use of 3rd Party software, custom programming provided by New World and/or future enhancements to Exhibit A software provided under Exhibit C." | Exhibit 2, p. 70. |
| 20. | Exhibit N of the Agreement also expressly stated: "If the terms and conditions of the New World Detail Response to the specifications of the RFP and this Agreement are in conflict, the governing terms and conditions shall be this Agreement." | Exhibit 2, p. 70. |

| | | |
|---|---|---|
| 21. | In addition, Section 19.1 of the Agreement provides: “This Agreement is the entire agreement between the parties and supersedes all other communications, written or oral, between the parties relating to the subject matter of this Agreement.” | Exhibit 2, p. 70. |
| 22. | The only other warranties in the Agreement were that the “Licensed Products will perform as specified in the user manuals based on the then-current release of the Licensed Software” and that New World possessed the necessary intellectual property rights to license the software. | Exhibit 2 at pp. 12-13. |
| 23. | Otherwise, the Agreement “expressly disclaims any express or implied warranties.” | Exhibit 2, p. 13. |
| 24. | The Agreement provided that, to the extent SRFECC contended that there has been a breach of warranty, New World would “correct the defect so that it conforms to the warranties” and, only if New World was not able to do so, could SRFECC pursue actual damages for breach of a specific warranty item. | Exhibit 2 at p.13. |
| 25. | New World’s liability pursuant to the Agreement is limited, and SRFECC is contractually prohibited from recovering, under any legal theory, “special, incidental, consequential, or punitive damages, including lost profits.” | Exhibit 2 at pp. 17-18. |

| | | |
|---|---|---|
| 26. | Although SRFECC had the right to terminate the Agreement, the termination provisions did not provide for a refund of amounts previously paid other than as provided for in the warranty provisions. | Exhibit 2 at p. 17. |
| 27. | The Agreement did not actually provide a date certain by which the implementation of the CAD system would be completed. Instead, Exhibit D to the Agreement provided a "sample Project Plan." | Exhibit 2 at p. 46. |
| 28. | In 2017, as the parties were engaged in implementation activities, it became apparent to Tyler that SRFECC had expectations that went beyond a COTS system, were not industry standard, and were inconsistent with the requirements of both the RFP and the Agreement. | Flynn Dec. ¶ 10. |
| 29. | In August 2017, following the functional testing process described in the RFP Response, SRFECC began circulating a spreadsheet listing 2065 technical requirements from the RFP and characterizing a number of the requirements as "Fails." | Exhibit 14 at p. 233-42; Exhibit 24. |
| 30. | Tyler disagreed with the substantive suggestion that any item had "Failed" in the way SRFECC was using the term, Tyler adopted SRFECC's semantics to streamline the conversation and focus on addressing the issues SRFECC had identified so that the parties could move towards go-live. | Flynn Dec. at ¶ 17. |

| | | |
|---|---|---|
| 31. | For the next several months, representatives of Tyler and SRFECC participated in multiple meetings and calls so that SRFECC could try to clarify its perspective on the technical requirements at issue. | Flynn Dec. at ¶18. |
| 32. | During these discussions, SRFECC's representatives provided additional details regarding how they were interpreting the RFP's language and, for the first time, explained to Tyler certain additional and/or specific expectations for the software. | Flynn Dec. at ¶ 19. |
| 33. | Tyler's representatives frequently explained that what SRFECC was describing was not a COTS system. | Flynn Dec. at ¶ 19. |
| 34. | SRFECC's interpretations expanded the scope of the Agreement, would have required more than minor modifications, and would have been costly and time consuming. | Flynn Dec. at ¶ 19. |
| 35. | SRFECC wanted their end users to be able to change the fonts on their individual workstations. | Flynn Dec. at ¶ 28. |

| | | |
|---|---|---|
| 36. | Tyler's CAD software allows the end user to change the fonts on the vast majority of the workstation screens. | Flynn Dec. at ¶ 28. |
| 37. | A small percentage of the time, however, permitting an end user to change the font would actually alter the integrity of the software itself.  Tyler's CAD system is not designed to allow for those alterations | Flynn Dec. at ¶ 28. |
| 38. | SRFECC ignored Tyler's feedback, and insisted that Tyler's CAD software "Failed" the font requirement because it did not provide 100% font-configurability | Flynn Dec. at ¶ 28. |
| 39. | In instances where requested modifications were so outside the industry norm and market demand, and/or threatened the integrity of the software itself, Tyler advised SRFECC that it could not modify the software to meet SRFECC's request. | Flynn Dec. at ¶ 28. |
| 40. | In order to attempt to address SRFECC's other issues, Tyler requested that SRFECC prioritize the so-called "Fails" so that Tyler could develop a plan to address the most important issues first. | Flynn Dec. at ¶ 21. |

| | | |
|---|---|---|
| 41. | Tyler suggested that, as is common in software implementations of this nature, the most important modifications be addressed prior to go-live and other, less critical issues be addressed in due course after the system went live. | Flynn Dec. at ¶ 21. |
| 42. | SRFECC refused both suggestions, instead contending that all of the issues SRFECC identified as "Fails" had to be addressed prior to go-live. | Flynn Dec. at ¶ 22. |
| 43. | In September 2017, the parties jointly agreed that the previously scheduled November 6, 2017 go-live would need to be postponed. | Exhibit 18. |
| 44. | In agreeing to the postponement, SRFECC's Executive Director Teresa Murray stated: "[W]e understand we need to push the go live date" and "we understand Tyler/New World will be collaborating internally on a new project schedule with a timeline which will be presented to SRFECC at a date yet to be determined." | Exhibit 18. |
| 45. | In December 2017, in yet another attempt to educate SRFECC on the scope of the Agreement and the options for the project, Tyler prepared a PowerPoint presentation for the SRFECC project team. | Exhibit 5; Flynn Dec. at ¶¶ 24-34. |

| | | |
|---|---|---|
| 46. | In the December 2017 presentation, Tyler did not, as SRFECC contends, agree that there were 239 "Fail" items. Instead, as the presentation makes clear, Tyler believed there were only 161 items even at issue. | Flynn Dec. at ¶ 25. Exhibits 6, 8, 20, p. 3. |
| 47. | Of these, 41 were warranty items that represented "bugs" in the software that were being fixed prior to go-live; seven were significant enhancement requests; and 79 were items that SRFECC claimed were "Fails" and Tyler disagreed. | Flynn Dec. at ¶¶ 25-27. |
| 48. | Of the 161 items in Tyler's presentation, only 34 of those were items that Tyler agreed did not meet the RFP requirements based on SRFECC's additional explanation of how it was interpreting those requirements. | Flynn Dec. at ¶ 29. |
| 49. | Tyler agreed to characterize them as "fails" only based on extensive discussions between Tyler's subject matter experts and SRFECC's representatives over the course of the implementation, after the completion of functional testing and the exhaustive process of discussing the functionality in painstaking detail. | Flynn Dec. at ¶ 29. |
| 50. | The list of "agreed fails" was later reduced to 29 by agreement. | Declaration of David Bonini ("Bonini Dec.") at ¶ 16; Exhibit 8. |

| | | |
|---|---|---|
| 51. | With regard to those items, Tyler was either already developing the functionality for release in upcoming software updates or agreed to devote time and resources to develop functionality that SRFECC was requesting. | Flynn Dec. at ¶ 31. |
| 52. | Tyler's presentation also attempted to prioritize all of the 161 items SRFECC had put at issue. | Flynn Dec. at ¶ 32. |
| 53. | In an effort to be a good partner to SRFECC, Tyler did not limit its analysis and effort to the 34 items Tyler agreed to address.  Instead, Tyler prioritized and attempted to estimate how much development and enhancement time would be required for all 161 items. | Flynn Dec. at ¶ 32. |
| 54. | The purpose, from Tyler's perspective, was to educate SRFECC on the level of time and effort it would take to develop the nuanced, customized specifications SRFECC requested. | Flynn Dec. at ¶ 33. |
| 55. | Tyler wanted SRFECC to understand that what they were requesting was more of a custom-built CAD system and was inconsistent with the primary purpose of the Agreement—the purchase of a COTS system with minimal modifications. | Flynn Dec. at ¶ 33. |

| | | |
|---|---|---|
| 56. | Tyler's presentation was also intended to emphasize to SRFECC the concept of "continuous improvement," which is standard in the software industry. | Flynn Dec at ¶35. |
| 57. | Clients routinely go-live and then continue to receive additional software updates, features and functionality through planned new releases and/ or specific development efforts. | Flynn Dec. at ¶ 35. |
| 58. | Tyler hoped that SRFECC would appreciate the benefits of this model and recognize the negative, unnecessary impacts of their all-or-nothing approach. | Flynn Dec. at ¶ 35. |

Dated: September 7, 2018

**K&L GATES LLP**

By: /s/ Beth W. Petronio
BETH W. PETRONIO *(admitted pro hac vice)*
Attorneys for Defendant TYLER TECHNOLOGIES, INC.

Dated: September 7, 2018

**SEGAL & ASSOCIATES, PC**

By: /s/ Malcolm Segal
MALCOLM SEGAL
Attorneys for Defendant TYLER TECHNOLOGIES, INC.