Beth W. Petronio *(pro hac vice granted)*
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, TX  75201
Telephone:  (214) 939-5815
Fax:  (214) 939-5849
beth.petronio@klgates.com

Malcolm Segal (SBN 075481)
John T. Kinn (SBN 130270)
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA  95814
Telephone:  (916) 441-0886
Facsimile: (916) 475-1231
msegal@segal-pc.com

Attorneys for Defendant TYLER TECHNOLOGIES, INC., a Delaware Corporation F/K/A NEW WORLD SYSTEMS CORPORATION, a Surrendered California corporation

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO REGIONAL PUBLIC SAFETY COMMUNICATIONS CENTER D/B/A SACRAMENTO REGIONAL FIRE/EMS COMMUNICATIONS CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>TYLER TECHNOLOGIES, INC., a Delaware corporation F/K/A NEW WORLD SYSTEMS CORPORATION,  a Surrendered California Corporation,<br><br>T          Defendant. | Case No.: 2:18-1792-KJM-KJN<br><br>**DECLARATION OF KEVIN FLYNN IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION**<br><br>Date:         September 19, 2018<br>Time:        2:00 pm<br>Judge:       Hon. Kimberly J. Mueller<br>Courtroom: 3 |

DECLARATION OF KEVIN FLYNN

501783319 v9

## DECLARATION

I, Kevin Flynn, declare as follows:

1. I am Vice President of Professional Services in the Public Safety Division of Defendant Tyler Technologies, Inc. ("Tyler").

2. I have personal knowledge of the statements in this declaration and, if called as a witness, I would and could testify competently thereto from personal knowledge, except as to matters stated on information and belief, which I believe to be true.

3. I received my Bachelor of Science degree in Physics from the University of Notre Dame and my Master of Science degree in Physics from Michigan State University. I am a certified Project Management Professional.

4. I have extensive experience in public sector consulting and software development and implementation. I began my career as a software engineer for General Electric Aerospace in 1988. From 1993 to 1995, I was employed by Healthcare.com as a project manager. From 1995 to 1998, I was a Development Manager of PC/UNIX Applications for CBC Companies. From 1998 to 2001, I worked for Covansys as a Director of Retirement Systems in their Public Sector division. From 2001 to 2011, I was employed as a Technology Director at JP Morgan Chase Bank. Between 2011 and 2015, I was the Public Sector Practice Lead for Infor Global Solutions. In 2015 and 2016, I was the Vice President of Consulting Services, East Region for Accela Inc.

5. I joined Tyler in the role of Vice President of Professional Services in November 2016. Tyler is the largest software company in the nation that focuses solely on providing integrated software and related technology services to the public sector. Tyler's Public Safety division has implemented CAD systems for hundreds of public entities, including various counties in and around Northern California.

6. In my role as Vice President of Professional Services, I currently manage a portfolio of over 150 clients across the United States in Tyler's Public Safety division. My responsibilities include oversight of our professional services teams who implement our software, client relationship management, participation in sales processes, and assistance with development of content related to

Tyler's core software products. For every project that Tyler implements, I have executive oversight and responsibility for the professional services team. As such, I have visibility into and authority over how projects are deployed and managed on behalf of Tyler. And, although I have an executive-level role, I do become directly engaged in more discrete tasks or issues in certain client implementations. Plaintiff Sacramento Regional Public Safety Communication Center d/b/a Sacramento Regional Fire/EMS Communications Center's ("SRFECC") was one such client.

7.  Prior to August 2017, I was generally aware of the ongoing implementation activities at SRFECC and had oversight responsibilities for the professional services team there. It is my understanding that during the initial phases of the implementation SRFECC's team was generally timely with responses and coordinated well with Tyler on scheduling and necessary tasks. However, once the project schedule was put in place, SRFECC frequently changed the tasks or activities defined by the project schedule and requested additional onsite services from Tyler (at Tyler's expense) that were not imbedded in the schedule. At least twice, SRFECC cancelled scheduled onsite visits.

8.  In or around August 2017, I got more directly involved with implementation of a computer aided dispatch ("CAD") system at SRFECC. At that time, SRFECC and Tyler had been working on the implementation of the CAD system for approximately 18 months, and SRFECC had started to challenge certain features and functions of the software during functional testing.

9.  The CAD system that Tyler was contracted to implement at SRFECC was a "Commercial Off The Shelf" or "COTS" system, meaning that SRFECC was purchasing pre-existing software developed by Tyler that had been implemented at numerous other agencies across the country. A COTS system is designed to be implemented without significant customization. In contrast, SRFECC could have contracted for an entirely custom-built CAD system with another vendor, but did not. Custom-designed CAD systems are more time consuming and expensive than the COTS systems like the one SRFECC licensed from Tyler.

10. Item 5.2.1 of the SRFECC RFP (Exhibit 13 to SRFECC's Motion) specifically acknowledges "the intention of SRFECC to purchase primarily 'off-the-shelf' or basic CAD software functionality, requiring the minimum amount of modifications in order to support necessary functions and

interfaces…[.]" The parties' Agreement (Exhibit 2 to SRFECC's Motion) recognized that this was a COTS project and obligated Tyler to provide only the standard software and certain "Standard Software Enhancements and/or Customer Software" that were expressly outlined in the Exhibit B-3 to the Agreement. For those modifications or enhancements, the Agreement contemplated an analysis and assessment to verify the scope of the modification and a revised cost and timing estimate for such modification. Based on the revised estimate, SRFECC could determine whether it intended to proceed with the requested modification. Exhibit B-3 to the Agreement expressly provided that SRFECC would "be reasonable and flexible in not attempting to design the modifications to be more extensive than called for in the scope (cost and schedule) of this project." Exhibit B-3 to the Agreement also provided that SRFECC "agrees to cooperate in not making modifications and enhancements too extensive."

11.  After I got more directly involved with SRFECC, it quickly became clear to me that numerous individuals at SRFECC did not understand the nature of a COTS system, despite what their RFP and the parties' Agreement stated. Instead, SRFECC was continually requesting customization that was outside of the off-the-shelf functionality of Tyler's CAD system, and that was not contemplated by the parties' Agreement. Essentially, SRFECC wanted the Tyler CAD system to replicate the exact functionality of the SRFECC's legacy system, even though SRFECC had sought and contracted with Tyler for a Tyler CAD system.

12.  I recall one meeting, in November 2017, when Jerold Emery from Tyler was giving a presentation and using the term "COTS solution." One SRFECC CAD user thought he was using the term "COPS solution" to refer to a police station CAD system instead of a fire station CAD system. To me, this epitomized a lack of understanding among end users at SRFECC about the nature of the software being implemented. I and others from Tyler spent a great deal of time attempting to explain to SRFECC that the parties' Agreement, which provided for the implementation of Tyler's CAD system based on its COTS functionality, did not envision the type of customization that would be required to meet SRFECC's newly detailed requests. We repeatedly tried to explain to them that the Tyler CAD system they contracted for was inevitably going to include some differences that SRFECC's end users were going to have to get used to, even as they

3

DECLARATION OF KEVIN FLYNN

501783319 v9

enjoyed equivalent or improved functionality, product stability, and other significant benefits from the Tyler CAD system.

13. Based on my review of SRFECC's Motion, SRFECC's misunderstanding about the nature of a COTS system continues. For example, in paragraph 86 of Diane House's declaration, she indicates that SRFECC "provided timely input on the *design* and use of the system." This is precisely the viewpoint that created problems between Tyler and SRFECC regarding this project. A COTS-based system is off-the-shelf software that is not "designed" by the client. The CAD system SRFECC purchased had already been designed and functioned in a specific way. SRFECC's representatives, including Ms. House, routinely, however, expressed a desire to tell us how to "design" the software and how it should work.

14. Based on Tyler's standard practices from the outset of the project, overall project information, including status reports and other information, was kept in a Project Workbook that was available to representatives of both Tyler and SRFECC on a common SharePoint site. This type of Project Workbook is maintained on all similar Tyler projects and is typically updated multiple times a week with the latest information on events, deliverables, action items and other project information.

15. When I first became involved with SRFECC directly, there was some disagreement about the status of certain items that were tracked in the Project Workbook. Specifically, Tyler and SRFECC had disagreements regarding whether certain activities were properly coded as complete. For example, Tyler conducted a 1-week mobile training that was intended to be for 10-12 Mobile users. SRFECC brought dozens of users to the training. Some of the additional users had technical difficulties completing the mobile training. SRFECC took the position that the training had not been completed, while Tyler maintained that it had completed this item.

16. This was not an unusual occurrence during the SRFECC project. On more than one occasion, SRFECC ignored our requirements and best practices for the number of attendees at training sessions and would send many more than the recommended number. Tyler's model is typically to train the trainers, which allows our training instructors to train, in detail, a small number of necessary representatives who then are able to share that training with others in the organization.

Sending large numbers of individuals to training over our objection can actually make the training sessions less interactive and effective.

17. SRFECC's approach to other CAD team meetings was similar. Tyler's best practice on build team meetings, for example, was to have a few key Subject Matter Experts ("SMEs") at each session who have an understanding of what would best serve their end users. In this way, the build sessions have only a few experts with decision making power, not a large staff of people, all of whom may want something different out of the system. SRFECC's approach was to invite a large team to every build session. And, these individuals typically did not understand they were not designing a custom system. In Tyler's opinion, the participation of large numbers of individuals from SRFECC in build sessions was inefficient and resulted in numerous requests for additional extra-contractual functionality and modifications to the system.

18. Based on my knowledge of and involvement in this project, I believe that the status Tyler assigned to Project Workbook items was based on Tyler's good-faith, legitimate assessment of the item based on the contractual requirements. I do not agree with SRFECC's assertion that, simply because SRFECC took a different position on certain status designations, it can only mean that Tyler was falsely reporting that status. In fact, I disagree that Tyler made any false statements about the status of the project in the Project Workbook, in status reports, or otherwise. To my knowledge, no one at Tyler ever made a false statement about the project or falsely represented the completion of any milestone.

19. The items that Ms. House has identified on Exhibit 28 as "not complete" were all, to my knowledge, issues where Tyler believed in good faith that it had completed the specific deliverable. SRFECC apparently disagreed whether what was delivered was what SRFECC wanted, but that did not mean it was not delivered. For example, Item 171 on Exhibit 28 is the mobile training referenced above. In addition, the majority of the items marked as "not complete" by Ms. House on Exhibit 28 relate to tasks where Tyler was to "install and configure" or "upgrade" certain aspects of the CAD software (*e.g.*, 148, 451, 301, 291, 149, 305, 311, 308, 314, 317). SRFECC refused to consider any such items "complete" until SRFECC had thoroughly tested the functionality of the *installed* software and confirmed no issues existed. Tyler repeatedly explained that the project plan

had distinct and separate tasks related to the testing of installed and configured software and to the remediation of any issues identified. Tyler identified the "install and configure" or "upgrade" tasks as complete when the software was actually installed, configured and/or upgraded. The functional testing came later, and was identified as a separate task on the project plan.

20.    When disagreements regarding the status of items on a project plan arise, standard practice in a typical implementation would be for the client and Tyler to work through those items at the project-leader level. Tyler tried to do that here. To my knowledge, SRFECC never expressed the belief that the status reports contained "false and misleading" information until this lawsuit was filed. SRFECC certainly never expressed that belief to me.

21.    In August 2017, shortly after I became directly involved in this project, SRFECC's project manager Diane House circulated a spreadsheet that included 2065 line items that represented the technical specifications from SRFECC's Request for Proposal ("RFP") issued in March 2014. That spreadsheet is attached to SRFECC's Motion as Exhibit 24. SRFECC's spreadsheet used the term "Fail" for technical requirements that SRFECC claimed did not meet the technical specifications in the RFP following the functional testing process described in the RFP Response (Exhibit 14, p. 233-42). Although Tyler disagreed with the substantive suggestion that any item had "Failed" in the way SRFECC was using the term, Tyler adopted SRFECC's semantics to streamline the conversation and focus on addressing the issues SRFECC had identified so that the parties could move towards go-live.

22.    Following receipt of SRFECC's spreadsheet, and for the next few months, I and others on my team participated in multiple calls and meetings with SRFECC's representatives so that SRFECC could try to clarify its perspective on the specific "Fails" SRFECC identified. Typically, I participated in project calls with individuals from Tyler and representatives of SRFECC, including Teresa Murray and Ms. House, at least twice a week. I also sent members of my team that were subject matter experts in various aspects of the software to meet with representatives of SRFECC to better understand their expectations for each of the technical requirements on the spreadsheet. I specifically requested that David Bonini serve as an "interface" between Tyler and SRFECC. In

6
DECLARATION OF KEVIN FLYNN

501783319 v9

1 order to better understand SRFECC's stated concerns, I requested that Mr. Bonini essentially remain
2 a "neutral" between the parties in an effort to ensure positive and productive communication.

3 23. During these meetings and in related written communications, SRFECC's representatives,
4 including Ms. Murray, Mr. Thuesen, and Ms. House, provided additional details regarding how they
5 were interpreting the RFP's language and, for the first time, explained their additional and/or
6 specific expectations for the software. During these discussions, it became clear that SRFECC was
7 interpreting a number of technical requirements in a manner that was not Tyler's understanding of
8 either industry standard or what was required by the parties' Agreement. The Tyler team frequently
9 explained to individuals at SRFECC, including Ms. Murray, and Ms. House, that what SRFECC was
10 seeking in connection with the software was beyond the scope of the COTS system, the Agreement,
11 and the RFP requirements. SRFECC's interpretations would require modifications beyond that
12 contemplated by the Agreement that would be costly and time consuming. SRFECC consistently
13 refused to acknowledge that its requests were more akin to a fully customized system than a COTS
14 system.

15 24. Tyler regularly makes new releases of its product available to its clients, and those clients
16 who are paying maintenance and support fees are entitled to those new software releases for no
17 additional license fees. Given that SRFECC opted to prepay 5 years of its maintenance and support
18 fees, SRFECC was entitled to all those releases for at least 5 years from the date the software was
19 delivered to SRFECC.

20 25. In order to attempt to address SRFECC's challenges, Tyler requested that SRFECC prioritize
21 the "Fails" so that Tyler could develop a plan to address the areas SRFECC deemed most important
22 first. In addition, Tyler suggested that, as is common in software implementations of this nature, the
23 most important modifications be addressed prior to go-live and other, less critical issues be
24 addressed in due course after the system went live.

25 26. SRFECC refused to engage in that assessment with Tyler. Instead, SRFECC, through Ms.
26 House and others, was adamant that all of the issues identified on their spreadsheet be addressed
27 prior to go-live—even issues that Tyler did not agree to designate as "Fails." As a result, in
28 September 2017, the parties jointly agreed that the previously scheduled November 6, 2017 go-live

7
DECLARATION OF KEVIN FLYNN
501783319 v9

would need to be postponed.  Exhibit 18 to SRFECC's Motion is the email that I sent to SRFECC confirming the postponement.  That email confirms that SRFECC was requiring all items to be addressed prior to go live.  In response to my email, SRFECC's Executive Director Teresa Murray stated: "[W]e understand we need to push the go live date" and "we understand Tyler/New World will be collaborating internally on a new project schedule with a timeline which will be presented to SRFECC at a date yet to be determined."  *See* Exhibit 18.

27. Following the postponement of the go-live date, the parties continued discussing the items that were identified as "Fails" on SRFECC's spreadsheet and that SRFECC was insisting on modifying in the COTS solution prior to go-live.  The parties' disagreements and ongoing discussions were documented in numerous versions of the spreadsheet that were exchanged during this time, including the various versions of the spreadsheet attached to SRFECC's Motion (*see, e.g.*, Exhibits 6 and 24).  Those spreadsheets contain comments from both parties regarding the technical requirements and established that the parties' interpretations of those technical requirements were not shared, and that their views differed on whether the software complied.

28. Internally at Tyler, because SRFECC refused to prioritize its own issues, my team was assessing each of the items that SRFECC was insisting on having prior to go-live and attempting to develop a reasonable plan to address those items.  Following our review and analysis, I prepared the PowerPoint that is Exhibit 5 to SRFECC's Motion.  The purpose of the presentation was to propose a project completion plan that would allow SRFECC to go-live as soon as possible.

29. At the time the presentation was prepared, Tyler believed there were 161 items that had been identified by SRFECC, through Ms. House and others, during the course of discussions that SRFECC insisted on addressing. I did not then, and never did, agree that all 161 items were "Fails" in the way SRFECC has co-opted the term.  Instead, my presentation categorized these 161 items into four categories.  Forty-one items on the list were "warranty" items, meaning that Tyler agreed there were "bugs" in the software identified during functional testing.  These types of "bugs" are not unusual to find in testing, and I consistently committed to SRFECC—as I would to any other client—that those "bugs" would be resolved prior to go-live.

8

DECLARATION OF KEVIN FLYNN

501783319 v9

30. My presentation noted seven items that I understood SRFECC had requested as specific enhancements. An enhancement means a customized feature or functionality outside of the COTS product. In identifying those items as enhancements, SRFECC was acknowledging they were outside the scope of the project, and therefore not contemplated by the parties' Agreement. To the extent these items were going to come in scope, they would need to be part of an amended scope of work agreed to and executed by all parties as a formal amendment to the Agreement.

31. My presentation identified seventy-nine items as items that SRFECC contended were required by the RFP, but not met by Tyler's CAD system. SRFECC, through Ms. House and others, was insisting on having these items prior to go-live. With regard to these items, Tyler disagreed with SRFECC's position. Tyler believed then—and believes now—that the Tyler CAD system delivered the functionality identified in the requirement, but SRFECC did not like *the way* the CAD system delivered the functionality. That does not constitute a "Fail," but it does constitute a potential enhancement Tyler would consider providing to SRFECC, at cost or no-cost. Of these items, I identified six that were being excluded from such consideration because they represented modifications that did not align with the CAD product (because they were so unusual or nuanced that no other client in our base would use them) and/or would be cost prohibitive to develop solely for SRFECC.

32. For example, SRFECC wanted their end users to be able to change the fonts on their individual workstations. Tyler's CAD software allows the end user to change the fonts on the vast majority of the workstation screens. In a small percentage, however, permitting an end user to change the font would actually alter the integrity of the software itself. As a result, Tyler's CAD system is not designed to allow for those alterations. SRFECC ignored Tyler's feedback, insisted that its requirement (a requirement that consisted of the single word "Fonts") be satisfied with 100% font-configurability, and cited the item as a "Fail" based on its unilateral position. In these instances where the requested modification was so outside the industry norm and market demand, and/or where it threatened the integrity of the software itself, Tyler advised SRFECC that it would not agree to modify the software to meet SRFECC's request.

33. With regard to 34 of the requirements, my presentation stated that those items "failed to comply with the RFP requirement" as those items were being interpreted by SRFECC. My team had reached this conclusion based on extensive discussions between our subject matter experts and SRFECC's representatives over the course of the implementation, and specifically after the completion of functional testing and the exhaustive process of exchanging multiple versions of the spreadsheet referenced above.

34. The RFP requirements frequently gave very short descriptions of very complex technical functionalities. Our multiple exchanges and discussions with SRFECC's technical representatives gave us, for the first time, the understanding that SRFECC was interpreting those 34 requirements in a way much different than Tyler had when responding to the RFP, and much different than the black-and-white language of the corresponding requirement. As a result, at the time of my presentation, Tyler had a clearer picture of how SRFECC was interpreting the specific RFP requirements and applying those requirements to the software. In many instances, SRFECC was interpreting the RFP requirements in a manner that was inconsistent with industry standards and unlike any other Tyler customers had done before.

35. Despite our differences, with regard to these specific 34 items, once Tyler understood what SRFECC desired from certain functionality, we recognized that our current system did not function in that manner. In some instances, we were already developing an update to the existing software to address the specific functionality requested. Tyler agreed that, consistent with our Agreement, SRFECC would be given that functionality free of cost in future releases of the software. In other instances, Tyler agreed to devote significant time and resources to develop functionality that SRFECC was requesting. In doing so, I was certainly not suggesting that New World had lied about the functionality in the first place. To the contrary, I believe that New World had accurately responded to the RFP given the information it had at the time. Moreover, I was not admitting that Tyler had breached the Agreement because those 34 items were "Fails." To the contrary, we agreed to deliver the functionality that would satisfy the corresponding requirements, as contextualized with the additional detail SRFECC provided after functional testing. SRFECC terminated the Agreement before Tyler was able to deliver that functionality.

36. Once I had broken out these four categories, Tyler prioritized those items that would require additional software modifications. We prioritized all of the 161 items SRFECC had put at issue by the time of my presentation. In an effort to be a good partner to SRFECC, we did not limit this analysis and effort to the 34 items discussed above. In all events, our prioritization represented Tyler's best, educated assessment as to how SRFECC would have prioritized the items, if they had been willing to do so. As noted above, SRFECC, through Ms. House and others, had refused to provide us with their own prioritization, instead simply stating that all items were required before go-live. My presentation provides an estimate for the number of development hours that would be required to complete all of the 161 enhancements/ modifications based on the prioritization assigned by Tyler.

37. I never intended to suggest in my presentation, and do not agree with the characterization, that Tyler would require an additional 17 years and 40,000 hours to deliver the COTS-based CAD software required under the Agreement. The estimates in my presentation represent the level of effort it would have taken Tyler to develop the nuanced, customized specifications SRFECC detailed to Tyler for all 161 items. The parties' Agreement, however, did not require a completely customized CAD system, which SRFECC was insisting on. Had Tyler been implementing the COTS-based CAD system that was the subject of the parties' Agreement, the additional development time would have been significantly less. If, for example, Tyler had been required to develop modifications/enhancements for only the 34 items that Tyler was willing to treat as within the scope of the Agreement, the development effort would have taken far less time. Moreover, had SRFECC been willing to prioritize items, those enhancements/modifications could have been accelerated. My presentation actually suggested to SRFECC that we set a June 2018 go-live date for the CAD system.

38. My goal in presenting this information in this manner was to highlight for SRFECC that they were essentially insisting on a custom-built system instead of the COTS system they had agreed to purchase. I also wanted to emphasize that it would be a sounder decision, at many levels, to go live with less than all of the SRFECC-mandated 161 items completed and then continue to enhance the

11
DECLARATION OF KEVIN FLYNN

1 system thereafter. This was especially true give the fact that the majority of the items were not
2 required by the parties' Agreement in the first instance.

3 39. The concept of implementing additional functionality after go-live is referred to as
4 "continuous improvement." Clients routinely go-live and continue to receive additional features and
5 functionality to the software through planned new releases and/ or specific development efforts. I
6 expected that if I presented the information in this way to SRFECC, SRFECC would appreciate the
7 benefits of this model and recognize the negative, unnecessary impacts of their all-or-nothing
8 approach to the 161 items they had been insisting on receiving prior to go-live.

9 40. I provided my PowerPoint presentation by email to SRFECC several days in advance of a
10 scheduled meeting with SRFECC on December 7, 2017. I was expecting this meeting to be with a
11 few SRFECC representatives and the various Chiefs or Deputy Chiefs involved in the project, as part
12 of our ongoing collaboration. I was informed by either Ms. House or Ms. Murray a few days prior to
13 the meeting that SRFECC's entire CAD team would be present. In addition, when I arrived at the
14 meeting I was informed by Ms. Murray that SRFECC's legal counsel would be present and that the
15 meeting would be videotaped. The meeting was not the collaborative effort I had understood it
16 would be.

17 41. Following the meeting, Ms. House recirculated the spreadsheet the parties had been
18 exchanging. Despite the presentation I had just given, SRFECC was continuing to suggest that 239
19 RFP items had "Failed." I never agreed that 239 items "Failed," and I am not aware of any Tyler
20 representative ever agreeing that 239 items "Failed." To the contrary, before, during and after my
21 December 7, 2017 presentation I made it clear to that Tyler did not agree with SRFECC's
22 spreadsheet or with the characterization or number of "Failed" items. I continue to disagree that 239
23 items "Failed."

24 42. Of the 239 items that SRFECC claimed were "Fails," SRFECC has now asserted that 172
25 were items that New World had identified as "Fully Comply" in its RFP response. These 172 items
26 are identified (by number alone) on Exhibit 7 to SRFECC's Motion. It is my understanding that
27 Exhibit 7 was prepared by Ms. House. This document was not provided to Tyler prior to the filing
28 of the lawsuit and is not a document that Tyler agreed was (or is) accurate. Exhibit 7 includes over

12
DECLARATION OF KEVIN FLYNN

1 50 items that were software "bugs" that Tyler acknowledged would be fixed prior to go live. The
2 vast majority of the other items identified on Exhibit 7 are items that Tyler believed fully complied
3 with the parties' Agreement and RFP requirements.

4 43. SRFECC maintains that all 172 items should have been coded "Non-Compliant" in the RFP
5 Response. Tyler disagrees with that characterization. According to SRFECC, if the 172 items had
6 been coded "Non-Compliant," New World's RFP score would have been reduced and New World
7 would not have been awarded the contract. However, even if you take SRFECC's interpretations of
8 what the RFP requested as a given (which Tyler strongly disputes), the 172 items would have been at
9 least "Compliant as Modified" or "Partially Compliant," warranting at least 1 or 2 points, according
10 to Ms. House. Based on this, it is unclear what New World's score would have been and whether it
11 would still have exceeded the score of the other bidders in the RFP. Moreover, it is my
12 understanding that the technical scores were not the only criteria for awarding the RFP. SRFECC
13 has not made available the scoring sheets for Tyler (New World) or the other bidders, so it is
14 impossible for me—or anyone—to fully analyze the scoring.

15 44. Ms. House's declaration references just 14 specific RFP items that SRFECC contends were
16 marked "Fully Comply" in the RFP response and that SRFECC contends "Failed." With regard to
17 the other 158 RFP items on Exhibit 7, I am not aware of anywhere in the record where SRFECC has
18 explained the basis for its concerns or why that item was supposedly a "Fail."

19 45. With respect to the 14 items on which Ms. House elaborates, Tyler disagrees with the
20 assertion that these items "Failed," as SRFECC uses the term, and believes that, based on the
21 information available to New World at the time of the RFP response, a response of "Fully Comply"
22 was appropriate.

23 46. For example, requirement 5.2.5.6.C.a. in the RFP states: "The CAD system *may* also in
24 addition to soundex utilize other appropriate look-up aids *such as* type ahead. *If* type ahead is
25 utilized, the system shall only display as possible matches those streets on which the numeric
26 address that has been entered is a valid address (i.e., if the initial entry is 175 S. MA -- the type
27 ahead drop down would not show S. Main St, unless 175 was a valid address on S. Main St.)."
28 Based on the use of the terms "may" and "if" and the phrase "appropriate look-up aids such as type

13

DECLARATION OF KEVIN FLYNN

501783319 v9

ahead," Tyler did not believe that type ahead itself was required by the RFP. Tyler's CAD system included other look-up aids and did comply with the language of the RFP. In contrast, Ms. House's declaration claims that the CAD system "*must* be able to provide type ahead functionality." SRFECC's evolving insistence on type ahead functionality instead of "other appropriate look-up aids" is not consistent with the RFP as written. In any event, type ahead functionality was added to Tyler's software for other customers in March 2018, and could have/would have been provided to SRFECC as well.

47.     Requirements 5.2.5.6.D and 5.2.5.9.D state that "A list of possibilities should be displayed when a partial spelling or misspelling of a street name is entered" and "[t]he call taker shall be able to enter partial street names on both intersection streets." Tyler's CAD software had this functionality, but SRFECC did not like the way it worked and wanted modifications. Tyler agreed to modify the system to meet SRFECC's specific requests at no charge. SRFECC complains that my December 7, 2017 presentation projected the completion date for these modifications to be 2020. That estimate, however, was based on Tyler's own prioritization of development tasks. Had SRFECC identified this issue as "mission critical," as Ms. House's declaration now states, Tyler could have prioritized this item and completed the development effort much sooner.

48.     Requirement 5.2.5.6.F.b. states "[u]pon entry of the incident location, the CAD application software shall provide a look-up to the geographic database (geofile) to validate the location of the incident. The process shall facilitate validation of the incident's location. The location/geofile must support multiple 'aliases' for: Intersections." Requirement 5.2.5.6.F.c. requests the same look-up capability for "commonplace names." As evidenced by Ms. House's declaration, SRFECC's complaint about these requirements was that Tyler' look-up functionality did not have the ability to address "multiple venues" at a given location, which SRFECC referred to as "community codes." The RFP does not mention the possibility of multiple venues at a given location or the use of "community codes." Tyler's CAD software fully complied with the RFP and provided look-up functionality that was in use in numerous other agencies. SRFECC's after-the-fact addition of the need to address "multiple venues" is a modification to the RFP requirements that no other client had

1  ever requested of Tyler.  Nonetheless, in order to address this modified RFP item, Tyler offered to
2  develop the requested additional functionality.

3  49.     Requirement 5.2.5.1.2.D.h in the RFP states that "the system must display the coordinates in
4  the State designated format (DMS, Decimal degrees, or UTM)."  During the time of this specific
5  RFP response, New World had just completed a new version of its CAD software.  The older version
6  was able to process and display the coordinates as specified in the RFP, while the newer version was
7  able to accept coordinates in the state format, but did not display them in that format.  As soon as
8  Tyler determined that the newer software contained different formatting, Tyler agreed to provide this
9  functionality and the item was scheduled for completion in 2018.  Like other issues, if SRFECC had
10 prioritized this issue, it could have been developed and delivered more quickly.

11 50.     RFP requirement 5.2.5.6.B states: "The CAD shall utilize a "soundex", "megaphone", and/or
12 other appropriate look-up aids for street names, intersections, commonplace names, landmarks, or
13 street or highway route numbers. (Windows type ahead is not soundex nor a metaphone)."  The
14 requirement expressly permits the use of "other aids".  The Tyler CAD system allows the use of
15 "wildcards" in searching street and other names, which provides a display of names that contain a
16 sequence of characters anywhere within the name.  This functionality is very similar to soundex and
17 certainly would qualify as an "other aid" in compliance with the RFP.

18 51.     RFP requirement 5.2.5.6.I states: "The call taker must also have the ability to restart the
19 location look-up with a new location."  Tyler's CAD system complies with this requirement by
20 allowing a user to restart location look-up by exiting the address verification window and opening a
21 new window.  SRFECC expressed a desire for the functionality to work differently.  The Tyler team
22 repeatedly told SRFECC that their preference for different functionality did not mean that the
23 software had "Failed" to comply with the RFP.  Tyler never agreed with SRFECC's characterization
24 that this was a "Fail."

25 52.     Requirement 5.2.5.6.T states: "The system shall allow for a street name to be entered without
26 a block range and/or city and return all possible ranges with City and location to be used to query the
27 caller as to which is the correct choice."  Tyler's CAD software requires an address to be entered.  It
28 complies with the requirement because it does not require a block range or city to be entered.  Ms.

15
DECLARATION OF KEVIN FLYNN

501783319 v9

House declaration explains how SRFECC now would like this functionality to work: "if a caller reports an emergency on Folsom Blvd, the dispatcher should be able to enter "Folsom Blvd" and see possible locations that the dispatcher can then list to the caller to help them ascertain their location." After SRFECC explained in more detail what it was looking for in connection with this requirement, Tyler agreed that it would develop the requested additional functionality. Ms. House's declaration expresses a concern about not having this functionality until 2019, but, as I indicated before, if SRFECC had agreed to prioritize the requested development tasks, this functionality could have been delivered sooner.

53.   RFP requirement 5.2.5.7.G states: "If the common place is a multi-unit structure with common places names associated with the sub units the system shall display a list of additional common-places that the operator may choose from." Tyler's CAD system provided this functionality, but SRFECC did not like the way it functioned. Nonetheless, Tyler agreed to develop the functionality in the manner requested by SRFECC and the functionality would have been delivered in June 2018, but for SRFECC's termination of the Agreement.

54.   Requirements 5.2.6.4.B.1 and 5.2.12.8 state: "The CAD software shall provide the following basic functions/information when a call for service is retrieved for dispatch:  Geofile information, to include:  Latitude and Longitude" and "Once an incident location is entered into the proposed CAD system, the location verification step shall add the coordinates of the incident's location to the incident record and display an incident icon on the tactical map display." The Tyler CAD system provides this capability, as described by Ms. House in her declaration:  "The user must open the mapping client, find the location of the incident manually, hover over the location with the mouse, then read the coordinates from the temporary label." The functionality is in compliance with the RFP. SRFECC, however, would prefer that this functionality worked slightly differently than it currently does. The Tyler team repeatedly told SRFECC that Tyler had complied with the RFP and that this item should not be characterized as a "Fail."

55.   The requirement 5.2.2.C.b states: "The selected Vendor must tailor the CAD system to fit the requirements of SRFECC. This will be accomplished through either *minor* customization of the CAD system software or, primarily, through adjustments in:  tab order through fields." Tyler's

1 software allows the user to use the tab button on the keyboard to cycle through the various fields and
2 buttons within the application without having to touch the mouse.  It therefore complied with the
3 RFP requirement.  SRFECC desired to modify the way the core Tyler software works so that they
4 could specify exactly which fields and buttons the tab button would highlight, and which ones would
5 be skipped over, as well as the order in which the tab button traversed these same fields and buttons.
6 This change is a highly customized requirement that is uniquely specific to SRFECC and would be
7 of no commercial use for Tyler.  This capability would not be valued by any of the hundreds of other
8 Tyler customers.  The customization is in no way a "minor customization of the system software" as
9 is indicated within the requirement verbiage, but would instead require significant modification to
10 the core system software.  Tyler advised SRFECC that it would not make this modification.

11 56.    Requirement 5.2.2.C.f states: "The selected Vendor must tailor the CAD system to fit the
12 requirements of SRFECC. This will be accomplished through either *minor* customization of the
13 CAD system software or, primarily, through adjustments in:  button labels."  Tyler's software allows
14 minor customization of the button labels as specified in the requirement.  However, SRFECC desired
15 to modify all button labels, independent of size, throughout the entire system.  The core software
16 protects some of these button labels because changing the labels indiscriminately could potentially
17 change the entire screen layout in a way would negatively impact the usage of the screen by
18 rearranging other items located on that screen.  In addition, allowing each individual user to modify
19 the button labels to suit their needs, while not impacting any other users, constitutes an extremely
20 large change to the core software and is in no way a "minor customization of the system software" as
21 is indicated within the requirement verbiage.  In fact, Tyler's development staff, under my
22 supervision, determined that it would not be possible to modify the software in a way that would
23 satisfy SRFECC's stated desires without dramatically altering the viability of the software itself.
24 Tyler advised SRFECC that it would not provide this modification.

25 57.    In summary, I believe that New World correctly represented the capabilities of the software
26 given the descriptions within the RFP.  The software Tyler delivered to SRFECC complied with the
27 written requirements of the RFP, the Agreement, and with the vast majority of the requirements as
28 further defined by SRFECC during the implementation.  The large majority of the requirements

deemed by SRFECC to be "Fails" are desires on the part of SRFECC to have the Tyler software work in a way that closely mimics the current SRFECC system. SRFECC repeatedly ignored and continues to ignore Tyler's position on those items.

58.  Tyler's system, however, is a COTS software package, to which the parties' Agreement and the RFP required only "minor customization."  SRFECC's large number of requests to modify the software, and the significant amount of work required to make those changes, constituted an expansive, wide-ranging, and wholesale set of SRFECC-specific customizations not contemplated by the parties' Agreement.  Even for the small number of requirements that Tyler was willing to agree did not "comply" with the RFP, SRFECC's specific requirements and unique interpretation of the RFP requirements only came to light after much discussion and explanation from SRFECC.  In these cases, Tyler agreed to modify the software to address each of SRFECC's issues, but SRFECC refused to prioritize the items in a meaningful way in order to work toward their delivery.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this the 7th day of September, 2018, at Galena, OH.

_____
KEVIN FLYNN